**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-337 (CRC)** |
| **v.** | : | |
| | : | |
| **CODY LEE TIPPETT,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Cody Lee Tippett ("Tippett") has pleaded guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four). For the reasons set forth herein, the government requests that this Court sentence Tippett to 45 days' incarceration on Count Three and 36 months' probation on Count Four. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

## I.     Introduction

Defendant Cody Lee Tippett, a 33-year-old business owner, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power

after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Tippett pleaded guilty to two violations of 40 U.S.C. § 5104(e)(2). The government's recommendation is supported by Tippett's (1) approaching the Capitol from the West side, where he witnessed clear police attempts to deter rioters and rioters violently resisting the police; (2) entering the Capitol building through the Senate Wing Door with the first wave of the breach, only six minutes after rioters first broke in; (3) chanting and posing for celebratory photographs inside the Capitol; (4) facilitating the riot, specifically by moving furniture to prevent a hallway door from closing; (5) remaining inside the Capitol building for over 30 minutes; (6) remaining on Capitol grounds for more than 2 hours overall; and (7) minimizing his actions following his arrest.

The Court must also consider that Tippett's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Tippett's crime support a sentence of 45 days' incarceration and 36 months' probation in this case.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 19 at ¶ 1-7 (Statement of Offense).

*Defendant Tippett's Role in the January 6, 2021 Attack on the Capitol*

Tippett, along with friend Dustin Martin ("Martin"),[2] drove from Columbus, Ohio to Washington, D.C. to attend the former president's "Stop the Steal" rally. On January 6, 2021, Tippett attended this rally and heard the former president say, "we are going to walk down to the Capitol."[3] Tippett and Martin then walked from the Ellipse on the National Mall towards the U.S. Capitol.

Tippett entered the restricted Capitol Grounds before 1 p.m., within minutes of the initial breach of the restricted perimeter at the Peace Circle. Open-source video shows Tippett appearing to film on his cell phone as he approaches the Capitol's Lower West Terrace via the Pennsylvania walkway, leading from the Peace Circle to the Lower West Terrace, while he joins other rioters celebrating the perimeter's breach (see Image 1).[4]

---

[2] Martin was charged with one count of 18 U.S.C. § 1512(c)(2), one count of 18 U.S.C. § 231(a)(3), and the four misdemeanor counts with which Tippett was also charged. Martin's case, 24-cr-30 (LLA), is still pending in district court.

[3] Exhibit 1: Open source video found at https://www.facebook.com/sarahjoking/videos/10225415720320404, at 15:30.

[4] Exhibit 2: Open source video found at https://ia904509.us.archive.org/33/items/A9JqYSmiG8RHnHFQh/10158753294723286.mpeg4, at 33:20.



*Image 1: Open-source video of Tippett approaching the Lower West Terrace at about 1:30 p.m.*

Tippett remained around the Lower West Terrace for about an hour. Throughout this time, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry the crowd brought or seized from the inaugural stage construction site. Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.  Instead, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles. Tippett witnessed violence here firsthand. He observed the police fire bean bags and tear gas into the crowd while rioters pushed against the police and chanted phrases such as "hold the line" and "stop the steal."[5] Open-source media shows Tippett right near the police line at this time (see image 2).[6]

---

[5] *See* ECF 19 (Statement of Offense) at ¶ 10.
[6] Exhibit 3: Open source video found at
https://ia902301.us.archive.org/16/items/8kW9dRXZf7H3jNj4W/146152467_civil_unrest_un.mpeg4; Exhibit 4: Open source video found at



*Image 2: Open-source photo of Tippett near the police line on the Lower West Terrace*

At approximately 1:50 p.m., a group of rioters pushed past police and stormed a set of stairs that led from the Lower West Terrace to the Upper West Terrace, and direct entry to the Capitol Building. The stairs were covered in scaffolding and tarp intended for use in the upcoming inauguration. Other rioters, including Tippett and Martin, followed that initial group up onto the stairs underneath the scaffolding, with hundreds of rioters lining up behind them. However, another police line prevented the crowd from advancing further up the stairs. At approximately 2:10 p.m., the rioters again pushed past that police lines on the steps and gained access to the Capitol Building for the first time that day.[7]

The rioters approached the Senate Wing Doors, breaking through the glass windows on either side and breaching the door at approximately 2:13 p.m. Tippett approached this same area minutes after, as the crowd chanted, "our house." At approximately 2:15 p.m., he stood right in

front of the window and watched as other rioters began to *flee* the building through the broken window (see image 3).  One of those rioters said to Tippett and Martin, "they started shooting at us…rubber bullets. It fucking hurts." [8] Nevertheless, Tippett entered the Capitol Building through the Senate Wing Door four minutes later, at approximately 2:19 p.m. (see image 4).[9]



*Image 3: Open-source video of Tippett watching rioters flee Capitol through a broken window*



*Image 4: CCTV footage of Tippett entering Capitol via Senate Wing Door*

---

[8] Exhibit 5, Open-source video at 44:14.
[9] Exhibit 6, CCTV 0102, at 2:19 p.m.

6

Tippett and Martin walked into the Crypt, and joined a large crowd of rioters chanting and, in the front of the room, pushing against a line of police officers. Tippett picked up a sign off the ground that said "closed" and held it up to the crowd, smiling as other rioters took photos (see image 5).



*Image 5: Tippett holds up "closed" sign to other rioters and poses for photos*

As the crowd pushed the officers back, Tippett advanced further into the Crypt, and then entered an area referred to as the Upper-Level Entrance to the Capitol Visitor's Center (CVC).[10] At approximately 2:30 pm, USCP officers in this area attempted to lower two large security doors to close off the hallway, and retreated into the CVC as rioters threw objects at them.[11]  As Tippett entered the area, he observed the large security door descending from the ceiling, and rioters working to prevent the security door from closing by placing furniture underneath it. Tippett joined

---

[10] Exhibit 7: CCTV 0402 at 2:24pm; 2:25pm.
[11] Exhibit 8: CCTV 7206 at 2:29pm.

in, placing a chair in the gate's path (see image 6). Tippett then passed through the opening the rioters created and continued down a flight of stairs into the CVC.[12]



*Image 6: CCTV footage of Tippett placing chair in the path of the security door*

Tippett and Martin remained in the CVC for about 15 minutes, where he encountered more law enforcement officers.[13] Tippett later reentered the Crypt, and then the Senate Wing hallway into which they originally entered. Tippett exited the Capitol Building through the window near the Senate Wing Door at approximately 2:53 pm, 34 minutes after entering.[14]

Despite what he had already observed on Capitol grounds and in the Capitol Building, Tippett did not immediately leave the area. Instead, he remained on the Upper West Terrace for nearly an hour, chanting with a crowd of rioters, even as those rioters again antagonized and assaulted police officers trying to control the crowd (see image 7).[15] Only when Martin was hit in

---

[12] Exhibit 10: Open-source video found at https://www.youtube.com/watch?v=wslA_vzlDbA, at 0:17; Exhibit 8, CCTV 7206 at 2:31pm.
[13] Exhibit 11: CCTV 7164 at 2:41pm.
[14] Exhibit 12: CCTV 0102, at 2:53pm.
[15] Exhibit 13: Open-source video found at https://www.youtube.com/watch?v=8Vh8wPeo6Jk&t=1377s, at 22:56.

the face with one such officer's prepper spray and required Tippett's help, did Tippett leave Capitol grounds.



*Image 7: Tippett remaining on Capitol Grounds long after exiting building*

Soon thereafter, Martin posted a photo to Facebook showing himself and Tippett giving two thumbs up inside the Capitol (see image 8).[16]



*Image 8: Photo of Tippett giving a thumbs up after breaching the Capitol*

---

[16] Exhibit 14: Screenshot of Facebook Post contained in anonymous tip provided to the FBI.

*Tippett's Interview*

On June 29, 2023, Tippett gave a voluntary post-arrest interview to the FBI.  During the interview, Tippett admitted to traveling to Washington because he wanted to "make his voice heard in relation to election fraud," and asking Martin to go with him.

Tippett stated that he and Martin "arrived [at the Capitol] very close to when the gate was opened, allowing them to be in the fourth or fifth row from the next police barrier." Tippett admitted to seeing "police fire bean bags and tear gas into the crowd around Tippett." And Tippett saw the crowd around him, "push back against the police" while he and Martin were four rows back from the barricades. Tippett also admitted to hearing the crowd shout, "hold the line," "USA," and "stop the steal," while this occurred. Tippett admitted to joining in their chants. Tippett also admitted to observing "multiple violent encounters," as well as members of the crowd "throw[ing] objects at the police." Tippett stated that Martin thought it may be best to leave, but Tippett wanted to stay.

Tippett admitted to seeing people enter the building through a smashed window. But he falsely claimed that "the police opened the doors to the Capitol Building and began to let people through."[17] Tippett stated that he and Martin walked around the building to areas that were not blocked off by police or barricades, taking pictures and chanting with others in the crowd. Tippett did not admit to picking up the "closed" sign or interfering with the metal doors in the CVC hallway. Tippett did admit to questioning whether he should be inside the Capitol multiple times.

Tippett admitted to going down a staircase adjacent to the building's visitor area, where he witnessed police attempting to block the area off. Tippett stated that he returned upstairs and exited

---

[17] CCTV footage of Tippett entering the building, *see* exhibit 6, *supra*, shows no officers in or near the doorway as Tippett enters the building.

the Capitol at police direction. Tippett admitted to remaining near the building after exiting and witnessing "pushing [] still going on between police and protestors." Tippett further stated that he left after being shown a video that Trump had released on social media.

During the interview, Tippett stated he was "surprised at his and Martin's arrests, as they were cleaning up trash left behind." This claim has not been substantiated by video evidence.

*The Charges and Plea Agreement*

On June 27, 2023, the United States charged Tippett by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On December 13, 2023, pursuant to a plea agreement, Tippett pleaded guilty to Counts Three and Four of the Information, charging him with violating 40 U.S.C. §§ 5104(e)(2)(D) and (G). By plea agreement, Tippett agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Tippett now faces a sentencing for violating 40 U.S.C. §§ 5104(e)(2)(D) and (G). As noted by the plea agreement and the U.S. Probation Office, Tippett faces up to six months of imprisonment and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. As described below, the Section 3553(a) factors weigh in favor of 45 days' incarceration on Count Three and 36 months' probation on Count Four, as well as 60 hours of community service.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Tippett's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Tippett, the absence of violent or destructive acts is not a mitigating factor. Had Tippett engaged in such conduct, he would have faced additional criminal charges.

The most important factors in Tippet's case are: (1) the clear signs he observed indicating that his entry was prohibited, including violence; (2) the amount of time he spent in the Capitol despite what he observed; (3) his celebration of the breach inside the Capitol; and (4) his facilitation of the breach by helping prop open a hallway door.

Tippett arrived on the Capitol's Lower West Terrace only minutes after the grounds were first breached; he stood right up against officers dressed in full riot gear as the rioters around him fought to break their police line. He observed, in his words, "police fire bean bags and tear gas into the crowd" to try and deter them. From this vantage, it was obvious that he was not allowed to be there and that the crowd he joined had become dangerous.

But Tippett was undeterred. He convinced his travel companion to stay. He chanted with the mob that was fighting the police. He joined that violent mob as it pushed past more police lines in order to access the Capitol Building. Again, he observed chaos as rioters chanted and climbed in through broken windows. One person told Tippett, "they're shooting at us."

But Tippett entered the building anyway. Police officers did not open the door for him. Inside, the violence continued as rioters surged through police lines and swarmed the Crypt. But Tippett did not turn around. Instead, he reveled in and encouraged chaos. He chanted with the crowd. He picked up a sign that said "closed" and held it high over his head for other rioters to see. He posed for photos. He then made his way deeper into the building, even helping to prop open doors to allow rioters to continue streaming through the halls. He stayed inside for more than 30 minutes. And even after leaving the building, he remained on Capitol grounds for nearly an hour, again chanting with a crowd that continued to assault police officers on the Upper West Terrace.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration.

### B.  Tippett's History and Characteristics

As set forth in the PSR, Tippett has a significant criminal history. In 2014, Tippett was convicted in federal court of conspiracy to distribute and to possess with intent to distribute Oxycodone. As a result, he served an 18-month period of incarceration, followed by two years of supervised release. His supervision was terminated early due to his successful participation in a drug court program designed to address his alcohol abuse. ECF 21 at ¶ 34.

Tippett also has six misdemeanor convictions: two for operating a motor vehicle while intoxicated, one for driving with a suspended or revoked license, one for disorderly conduct (he had originally been charged with assault for striking another individual), and one for violation of a protection order against his then wife, whom he physically assaulted. Especially relevant to our case, he was convicted of obstructing official business when he refused to follow the instructions

of a police officer who instructed him to sit in the back of a police cruiser while they searched his vehicle (where a concealed firearm was found). ECF 21 at ¶¶ 28-33, 48.

Tippett's criminal history demonstrates a need for specific deterrence in the form of both incarceration and probation. Tippett engaged in a multi-state scheme distributing oxycodone, participating in one of the worst drug epidemics in American history. As a result, he both served time and received substance abuse treatment. His history further includes a criminal conviction for disobeying law enforcement officers, conduct that lies at the heart of Tippett's conviction in this case as well. Frankly, he knew better. He was familiar with the criminal justice system and understood the consequences of disregarding the law and officers of the law. But this still did not stop him from participating in a violent riot that threatened to undermine the peaceful transition of power, a riot in which he witnessed assaults on police officers firsthand.

Tippett's lengthy criminal history shows more than just disregard for the law, but a significant risk of recidivism. The government understands that Tippett has worked to abate significant substance abuse issues, and currently runs a business with the help of his family, on which he and his family are, at least in part, financially dependent. However, Tippett both lived with his family and incorporated this business in 2018; the same circumstances were present on January 6, 2021. ECF 21 at ¶ 68. But again, they did not stop him from traveling to Washington, D.C. and participating in a violent riot.

Tippett's sentence must unequivocally demonstrate that disobeying the law, and the officers charged with maintaining it, carries serious consequences. Moreover, Tippett's repeated failure to follow the law and long history of instability and violence counsel favor of continuing supervision in addition to incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power."); *United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration.

First, as discussed above, Tippett's history of prior arrests and convictions, including for disobeying a police officer, reveals a pattern of disrespect for the law. Tippett's prior experiences with the criminal justice system, including serving a term of 18 months' incarceration and 2 years' supervised release, were insufficient to deter him from committing another crime on January 6.

Second, Tippett's actions in the Capitol on January 6th show a complete disregard for the chaos and violence in which he was participating. Despite watching police officers suffer assault after assault on the Lower West Terrace, Tippett posed for photos with his thumbs up and smiling while he held a "closed" sign over his head.  His actions, including helping prop open a hallway door, encouraged the other rioters to similarly make light of the violent riot underway and undermined police officers' attempts to subdue the mob. And although Tippett ultimately accepted responsibility by pleading guilty, he has not expressed remorse – instead, he minimized and obscured his conduct when he volunteered information to the FBI, expressing surprise that he was even arrested.

With the 2024 presidential election approaching and many loud voices in the media and

online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Tippett in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[18] This Court must sentence Tippett based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Tippett has pleaded guilty to Counts Three and Four of the Information, charging him with 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) and 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in any Capitol building). These offenses are a Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.

---

[18] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court has sentenced Capitol breach defendants who (1) entered the Capitol after witnessing violence against police officers on the Lower West Terrace, (2) entered via the Senate Wing Door as part of the first wave of the breach, (3) spent a considerable amount of time inside the Capitol building and/or on Capitol grounds, and (4) celebrated the riot as it occurred, (5) took actions to facilitate the riot, and (6) minimized their conduct afterwards.

Defendants who entered the Capitol after witnessing violence against police officers, and remained inside for longer periods of time, took additional steps to occupy the Capitol and displace Congress, because they had more opportunities to appreciate the violence and chaos they were supporting. The defendants who joined that first wave of the breach most clearly understood the violence of their entry, and in turn encouraged yet more rioters to storm the building. Defendants who celebrated the breach by chanting and posing for photos inside the Capitol expressed contempt for the law and encouraged others around them to continue sowing chaos and violence. Tippett engaged in each of these behaviors.

Moreover, defendants with criminal histories comparable to Tippett's knew better the consequences of disregarding the law and supporting violent behavior. To the extent Tippett urges favorable comparisons to defendants sentenced to probation only, but where significant criminal convictions did not factor in, such analysis is minimally relevant.

Nolan Kidd pleaded guilty to similar conduct, and this Court sentenced him to 45 days' incarceration. *United States v. Savannah McDonald and Nolan Kidd,* 21-cr-429-CRC. Like

Tippett, Kidd filmed the riot and chanted as he and others around him bypassed police lines and advanced towards the Capitol. Both entered the building despite observing police use tear gas to try and disperse the crowd. Both entered through the Senate Wing Doors shortly after the breach began and spent a similar amount of time in the Capitol (Kidd remained for 40 minutes to Tippett's 34). While Kidd entered the building several minutes before Tippett, Tippett was already in the vicinity of the Senate Wing Door within two minutes of the breach and plainly observed the violence of the breach, including when an individual told him, "they're shooting at us." Though Tippett did not send messages bragging about his participation in the riot on social media, he chanted and posed for photos in the Capitol, appearing to celebrate the riot, and like Kidd, did not express remorse in speaking with the FBI after his arrest. Especially in light of Tippett's criminal history, incarceration here is warranted.

In the related case of *Savannah McDonald*, the Court sentenced the defendant to 21 days' incarceration for substantially the same conduct, recognizing that entering the Capitol despite witnessing clear police attempts to deter rioters, with the first wave of the breach, and remaining inside for a significant time, warrants incarceration. The Court cited Kidd's leadership role as a primary reason for McDonald's lesser sentence. However, Tippett was the leader regarding his and Martin's conduct on January 6 – Tippett asked Martin to travel with him, and more significantly, convinced Martin to stay despite the violence they witnessed outside the Capitol.

Judge Chutkan also imposed a sentence of 45 days' incarceration where a defendant's behavior and history comprised a similar mix of factors. *See United States v. Edward Hemenway*, 21-cr-49-2 (TSC). Hemenway and Tippett both entered the Capitol through the Senate Wing Door at about 2:19 p.m., despite witnessing violence prior to their entry. Both entered the Crypt while rioters were attacking police officers. And both appeared to revel in the riot, with Hemenway

taking a selfie with his middle finger in the air. However, unlike Tippett, Hemenway left the Capitol shortly thereafter, spending only 17 minutes inside the building; Tippett continued deeper inside. And while both accepted responsibility through a guilty plea, neither expressed remorse in the aftermath of their actions, only after facing the consequences of their behavior post-arrest. For Hemenway, a 2006 felony conviction and subsequent incarceration weighed in favor of incarceration. If anything, Tippett's behavior was more disruptive – he spent twice as much time in the Capitol. Tippett's criminal history also speaks to a heightened need for specific deterrence. At minimum, a similar sentence of incarceration is warranted.

In another case before this Court, *Paul Von Bernewitz,* 21-cr-307-CRC, the defendant was sentenced to 30 days' incarceration. Both Tippett and Von Bernewitz arrived at the West side of the Capitol during the initial stages of the breach and witnessed violence against police, including countermeasures like tear gas. Tippett, like Von Bernewitz, was undeterred, and entered the Capitol anyway. While Von Bernewitz took the additional step of joining the crowd's push through police barricades, Tippett took addition steps to encourage the riot by chanting, holding up a "closed" sign to the crowd, posing for photos, and helping prop open a hallway door police had tried to close. Both have relevant criminal histories involving instances of aggressive behavior. Significantly, Tippett spent more than twice the amount of time in the Capitol as Von Bernewitz. A slightly longer period of incarceration would thus best reflect the severity of Tippett's conduct and need for specific deterrence.[19]

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is

---

[19] Von Bernewitz' brother, Eric, was sentenced to 24 months' probation, with 60 days of home confinement, for similar conduct. However, Tippett's significantly longer time inside the Capitol and criminal history distinguish him from Eric Von Bernewitz.

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[20] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

---

[20] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Tippett must pay $500 in restitution, which reflects in part the role Tippett played in the riot on January 6.[21] Plea Agreement at ¶ 10. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Tippett's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 96.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Tippett to 45 days' incarceration on Count Three and 36 months' probation on Count Four, 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution. Such a sentence promotes respect for the law and deters future crime by imposing restrictions on Tippett's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

---

[21] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ *Alexander Diamond*
        ALEXANDER M. DIAMOND
        NY Bar No. 5684634
        Assistant United States Attorney
        District of Columbia
        601 D St. NW
        Washington, DC 20530
        (202) 506-0427
        Alexander.Diamond@usdoj.gov